<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                       :
IN RE AUDIBLE INC. SECURITIES          :          Civil Action No. 05-1027 (JAG)
LITIGATION                             :
                                       :               **OPINION**
_____ :


<u>**GREENAWAY, JR., U.S.D.J.**</u>

This matter comes before this Court on the motion to dismiss[1] the Consolidated Amended

Class Action Complaint ("Complaint"), pursuant to FED. R. CIV. P. (12)(b)(6).  The motion was

filed by the defendants Audible, Inc.[2] ("Audible" or "Company"), Donald R. Katz[3] ("Katz" or

"Defendant Katz"), and Andrew P. Kaplan[4] ("Kaplan" or "Defendant Kaplan") (collectively,

"Defendants").  Since some allegations are brought against Katz and Kaplan individually, they

will be referred to as the "Individual Defendants."  For the reasons set forth below, the motion to

_____

[1]  The Motion to Dismiss was brought on behalf of all the defendants.  (Br. in Supp. of Defs.' Mot. to Dismiss Consol. Class Action Compl. 5.)

[2]  Audible is a Wayne, New Jersey based Internet audio information and entertainment service.  Audible sells spoken audio content, such as audio versions of books, newspapers, magazines, original productions, and public radio subscriptions over the Internet, allowing consumers to download materials on a per-item or subscription basis.  (Consol. Am. Class Action Compl. (hereinafter "Am. Compl.") ¶ 2.)

[3]  Katz served as Audible's Chief Executive Officer and Chairman of the Board throughout the Class Period.  (Am. Compl. ¶ 13.)

[4]  Kaplan served as Audible's Chief Financial Officer throughout the Class Period.  (Am. Compl. ¶ 14.)

1

dismiss will be granted and the Complaint will be dismissed, without prejudice.  Plaintiffs shall

have 30 days to file an amended complaint.

## **BACKGROUND**

Kirk Chung, H. Keith Morgan, Jungwhan Oh, and Frederick Pierson ("Plaintiffs"),[5] filed

a federal class action on behalf of purchasers of the securities of Audible, who claim to have

been damaged as a result of their purchase.  (Consol. Am. Class Action Compl. (hereinafter

"Am. Compl.") ¶ 1.)  The relevant time period is from November 2, 2004 to February 15, 2005,

inclusive (the "Class Period").  (Am. Compl. ¶ 1.)  Plaintiffs allege that Defendants violated

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 by their

actions and omissions.  (Am. Compl.  ¶ 74.)  Furthermore, Plaintiffs allege that by virtue of their

positions, the Individual Defendants are liable as controlling persons, pursuant to Section 20(a)

of the Exchange Act.  (Am. Compl.  ¶ 74.)

Plaintiffs commenced this securities class action against Audible and the Individual

Defendants, seeking damages under the Exchange Act.  Specifically, they allege that throughout

the Class Period, Audible reported increased revenues and earnings, growth that Defendants

represented would continue as the Company capitalized on an increasing demand for its products

and a growing customer base.  (Am. Compl. ¶ 3.)  Unbeknownst to investors, throughout the

Class Period, Defendants' representations were materially false and misleading because they

failed to disclose that Audible's continued growth was conditioned on capital-intensive

marketing and other initiatives that would severely and negatively impact the Company's

_____

[5]  On December 16, 2005, Plaintiffs were appointed as lead plaintiffs to represent the
interests of the class in this consolidated action.

earnings in 2005, and possibly beyond.  (Am. Compl. ¶ 4.)  Plaintiffs also allege that Defendants

knew that publicly announcing on February 15, 2005, cash-draining expansion initiatives would

dramatically crimp Audible's earnings for the foreseeable future and cause the Company's stock

price to plummet.  (Am. Compl. ¶ 4.)  Furthermore, Plaintiffs allege that Defendants delayed

disclosing their important, market-moving, cash-intensive initiatives until after the Individual

Defendants sold their personally held shares of Audible at artificially inflated prices in a

secondary offering.  (Am. Compl. ¶ 4.)  The secondary offering of 5,225,000 shares of common

stock at $24.50 per share occurred on November 18, 2004.  (Am. Compl. ¶ 12.)

      Defendants have moved to dismiss the Complaint claiming that (1) generally speaking,

the Complaint is defective because it fails to identify any misleading statement with the requisite

particularity since (a) Audible's statements about 2004 are not actionable because they were

factual statements about the Company's financial performance, and (b) "mere puffery" is not

actionable; (2) Plaintiffs' allegation that Defendants did not timely disclose the Company's

growth initiatives fails to state a claim because (a) the Complaint does not contain any facts that

support the inference that the Company decided as early as November 2, 2004 to invest in the

growth initiatives announced on February 15, 2005, and (b) the Company had no duty to disclose

that it was contemplating the initiatives before a final decision had been made; (3) Katz never

represented that the Company would achieve a 30% pretax operating margin in 2005;

(4) Plaintiffs' allegations regarding a customer service crisis fail to state a claim; and

(5) Plaintiffs fail to allege facts supporting a strong inference of scienter.  (Br. in Support of

Defs.' Mot. to Dismiss Consol. Class Action Compl. 12-29.)

**STATEMENT OF FACTS**

The Complaint contains a timeline of events that occurred during and immediately after the Class Period. These events form the basis of this securities class action. On November 2, 2004, the first day of the Class Period, Audible issued a press release announcing its financial results for the third quarter of 2004. (Am. Compl. ¶ 28.) The press release stated that (a) Audible had total revenue of $9.3 million, up 87% over the third quarter of 2003 and 15% over the second quarter of 2004; (b) Audible had net content and services revenue of $9.0 million, up 88% over the third quarter of 2003 and 14.5% over the second quarter of 2004; (c) Audible had free cash flow of $1.0 million, compared to $593,000 negative cash flow in the third quarter of 2003 and $611,000 positive cash flow in the second quarter of 2004; (d) the addition of 40,566 new customers, of which 31,726, or a record 78%, were AudibleListener members,[6] an increase of 29% in new AudibleListeners over the second quarter of 2004; and (e) Audible had net income of $483,884 and earnings per share of $0.02. (Am. Compl. ¶ 28.)

Defendant Katz, commenting on the results, touted Audible's membership gains, strong operational performance and strategic advances: "[o]ur success converting one-time buyers and free content users to AudibleListener membership is reflected in the numbers and percentage of new AudibleListener customers versus the total new customers. The strong operational performance in the quarter was matched by important strategic advances, notably our announcement of imminent operations in both France and Germany and our exciting partnership

---

[6] Most customers join the AudibleListener program, where, for a monthly fee of either $14.95 or $21.95, they may download and listen to a prescribed number of audio titles of their choice. AudibleListener members provide Audible with their credit card information and are billed monthly in advance for the AudibleListener service. Customers may also purchase individual audio titles on an à la carte basis. (Am. Compl. ¶ 37.)

with Sprint, Audible's first major wireless carrier technology and co-marketing alliance."  (Am. Compl. ¶ 29 (quoting Securities and Exchange Commission ("SEC") Form 8-K filed by Audible, Inc. on November 2, 2004 at 6, attached as Ex. B to the Mem. in Supp. of Defs.' Mot. to Dismiss (hereinafter "Ex. B")).)

Later that day, Katz and Kaplan held a conference call with analysts regarding the third quarter results and Audible's business in general.  (Am. Compl. ¶ 30.)  During the call, Katz and Kaplan reiterated the positive comments made in the press release.  (Am. Compl. ¶ 30.)  In relevant part, Defendant Katz represented that "[w]e firmly believe that the array of growth channels available to Audible will only increase as we move forward into the next few years. . . . Our internal sites [sic] are set on the fast pursuit (ph) of a million AudibleListeners, *and if you've studied our business model dynamics, you can understand why we expect to hit 30 percent pretax operating margins early in that growth front.*  The key metrics associated with our business all point to a strong finish to 2004 and solid momentum as we look out to 2005.  We intend to better serve our customers every day, to build on our leadership and to capitalize on the opportunities before us, so as to grow our revenue while delivering long-term profitability." (Am. Compl. ¶ 30 (emphasis in original) (quoting Tr. of Audible, Inc. Third Quarter 2004 Teleconference on November 2, 2004 at 5, attached as Ex. C to the Mem. in Supp. of Defs.' Mot. to Dismiss (hereinafter "Ex. C")).)

On November 15, 2004, Audible filed a Form 10-Q with the SEC, repeating Audible's third quarter 2004 results contained in Audible's November 2, 2004 press release.  (Am. Compl. ¶ 31.)  Following Audible's announcement of its third quarter 2004 results, various analysts issued reports commenting on Audible's positive results.  (Am. Compl. ¶ 33.)  For example, on

November 3, 2004, ThinkEquity Partners issued a report entitled "Strong Q3 - Sub Growth Robust" in which it reported that "[w]e have raised our estimates to better reflect the significant growth opportunity in front of the Company.  We are reiterating our Buy rating and raising our price target to $22 from $18 which reflects a 50x multiple on FY05 EPS estimate of $0.45 which is in line with the expected growth rate."  (Am. Compl. ¶ 33.)  Also on November 3, 2004, PiperJaffray issued an analyst report entitled "Device Frenzy Should Benefit Audible in December; Expect Momentum to Continue" in which it reported that "[w]e believe Audible's underlying market is strengthening.  We expect Audible to capitalize on the explosive growth in MP3 players in the December quarter.  The cumulation of these MP3 devices throughout 2005 should be the basis for Audible achieving 50% revenue growth."  (Am. Compl. ¶ 35.)

On November 18, 2004, Audible commenced a secondary offering of 5,225,000 shares of common stock at $24.50 per share.  (Am. Compl. ¶ 36.)  Of the shares sold, 1,500,000 shares were sold by the Company, with the remaining 3,725,000 shares being sold by shareholders, including Defendant Katz,[7] who sold 150,000 shares, allegedly amounting to 37% of his total

---

[7] The announcement of the stock sales was made on November 18, 2004.  According to Audible's SEC Form 8-K, which was filed on August 23, 2004, "Audible, Inc.'s founder and CEO Donald Katz has adopted a pre-arranged stock trading plan to sell company stock.  Mr. Katz may sell up to 48,000 shares of the stock over a twelve month period beginning today." (Securities and Exchange Commission ("SEC") Form 8-K filed by Audible, Inc. on August 23, 2004 at Item 8.01, attached as Ex. A to the Mem. in Supp. of Defs.' Mot. to Dismiss (hereinafter "Ex. A").)  A 10(b)5-1 plan provides an affirmative defense to an allegation of insider trading.  However, the plan must have been adopted prior to the person becoming aware of the material, non-public information.  17 C.F.R. § 240.10b5-1(c).  Therefore, it appears that at least some of the shares sold by Katz were sold pursuant to a 10(b)5-1 plan that was adopted prior to the time when the Complaint alleges he became aware of the non-disclosed information.

Audible shares, for a gross point profit of $3,675,000, and Defendant Kaplan,[8] who sold 125,000

shares, allegedly amounting to 82% of his total Audible holdings, for a gross profit of

$3,062,500. [9]  (Am. Compl. ¶ 13.)

On February 15, 2005, after the close of trading, Audible issued a press release

announcing results for its fourth quarter of 2004 and of the entire 2004 fiscal year.  (Am. Compl.

¶ 43.)  The press release reported the following highlights for the full year: total revenue of $34.4

million, total free cash flow of $4.2 million, and net income, before preferred stock charges, of

$2.2 million, as compared to a $3.6 million loss in 2003.  (Am. Compl. ¶ 43.)  Cash, cash

equivalents, and short term investments were $61.7 million at the end of 2004, as compared to

$9.1 million at the end of 2003.  (Am. Compl. ¶ 43.)  Finally, the addition of 41,600 new

---

[8]  "Andrew Kaplan, the [C]ompany's CFO, has also entered into separate 10b5-1 plan under which he may sell up to 24,000 shares over the next twelve months."  (Ex. A at Item 8.01.) Therefore, as with Katz, it appears that at least some of the shares sold by Kaplan were sold pursuant to a 10(b)5-1 plan that was adopted prior to the time when the Complaint alleges he became aware of the non-disclosed information.

[9]  Defendants argue that Plaintiffs miscalculated the percentage of Katz's and Kaplan's total holdings sold in the second offering by failing to include exercisable stock options as part of Katz's and Kaplan's total holdings.  (Br. in Support of Defs.' Mot. to Dismiss Consol. Class Action Compl. 26.)  When the shares of common stock issuable to Katz and Kaplan upon exercise of options are included as part of Katz's and Kaplan's total holdings, the percentages are reduced:  Katz sold 18.2% of his stock (as opposed to the 37% alleged) and Kaplan sold 31% of his stock (as opposed to the 82% alleged).  (Br. in Support of Defs.' Mot. to Dismiss Consol. Class Action Compl. 27.)  The Third Circuit has not explicitly addressed the question of whether to include exercisable stock options as part of a defendant's total holdings when calculating the percentage of stock sold.  However, in discussing percentage of stock sold, the Third Circuit has recognized that a large number of today's corporate executives are compensated in terms of stock and stock options and that these individuals will trade those securities in the normal course of events.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997) (citations omitted.).  See also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999).  Therefore, this Court concludes that it is reasonable to infer that the Third Circuit would likely believe that stock options should be taken into account when calculating an individual's total holdings.

AudibleListener members in the fourth quarter set a new record.  (Am. Compl. ¶ 43.)

Along with those results, Audible announced a series of new capital intensive spending plans and initiatives which would require substantial investments in infrastructure, new business units, and marketing.  (Am. Compl. ¶ 44.)[10]  In reaction to the announcements on February 15, 2005, the price of Audible common stock plummeted, falling from $26.70 per share on February 15, 2005 to $17.32 on February 16, 2005, a one-day decline of 35%, on unusually heavy trading volume of 20.9 million shares.  (Am. Compl. ¶ 48.)

## LEGAL STANDARD

### A.   FED. R. CIV. P. (12)(b)(6)

On a motion to dismiss for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  See In re Warfarin Sodium Antitrust Litigation, 214 F.3d 395, 397 (3d Cir. 2000).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  While a court will accept well-pled allegations as true

---

[10]  These spending initiatives included: (a) the launch of Audible UK during the second quarter of 2005; (b) the launch of Audible Wireless; (c) the launch of Audible Education; and (d) investing to achieve the following milestones targets: (i) doubling the number of AudibleListeners each year through 2006; (ii) doubling quantity of premium audio made available to Audible's listeners each week to 1,400 hours by the end of 2005; and (iii) improvements in Audible's customer service and customer communications capacity designed to drive customer acquisition and increase average revenue per user.  (Am. Compl. ¶ 44.)

for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 475 (1999).  Moreover, the claimant must set forth sufficient information to outline the elements of his or her claims or to permit inferences to be drawn that the elements exist.  See FED. R. CIV. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  Id. (citation omitted).  Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment.  FED. R. CIV. P. 12(b).

"[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.  Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied."  Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  Consideration of these referenced documents will not require the conversion of a motion to dismiss to one for summary judgment

9

under FED. R. CIV. P. 12(b)(6).  "The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond.  When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished."  Id. at 1196-97.  Even if a "[c]omplaint does not *explicitly* refer to or cite [a document] . . . the language in both *Shaw* and *Trump* makes clear that what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."  Burlington Coat, 114 F.3d at 1426 (emphasis in original) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) and In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993)).

**B.    FED. R. CIV. P. 9(b)**

In pleading fraud, FED. R. CIV. P. 9(b) establishes a heightened pleading standard by requiring that "the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."  Burlington Coat, 114 F.3d at 1418 (citations omitted).  Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'"  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. E&Y, 901 F.2d 624, 627 (7th Cir. 1990)).  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation

10

into their allegations of fraud.'" In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d

198, 216 (3d Cir. 2002) (quoting In re Nice Systems, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).

"[I]n applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated

defrauders' may 'successfully conceal the details of their fraud.'" Id. (quoting Burlington Coat,

114 F.3d at 1418). "Where it can be shown that the requisite factual information is peculiarly

within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be

relaxed." Id.

## C.      Section 10(b) of the Securities Exchange Act of 1934

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), prohibits the use of fraudulent

schemes or devices in connection with the purchase or sale of securities.  Under § 10(b), it is

unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any

manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the

SEC designed to protect the investing public.  To implement the statute, the SEC enacted Rule

10b-5, violation of which gives rise to a private cause of action.  Ernst & Ernst v. Hochfelder,

425 U.S. 185 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).  That rule,

in turn, deems it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) [t]o make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
>
> (c) [t]o engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.l0b-5.  The Supreme Court has held that standing to bring a private cause of

11

action under Rule l0b-5 is limited to actual purchasers or sellers of securities.  Blue Chip Stamps, 421 U.S. at 749.

The Supreme Court has recently noted that "[i]n cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss."  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005) (citations omitted).  See also In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 275 (3d Cir. 2006).

 Rule 9(b) imposes heightened pleading requirements on plaintiffs in Rule 10b-5 actions. "'Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.'"  In re Suprema, 438 F.3d at 276 (quoting In re Rockefeller Center Properties, 311 F.3d at 216 (internal quotation marks and citations omitted).)

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, further refines this standard by requiring that a complaint which asserts a §10(b) claim "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

15 U.S.C. § 78u-4(b)(1).  Further, if "proof that the defendant acted with a particular state of mind" is a required element of the claim, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2). "To the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter, 15 U.S.C. § 78u-4(b)(2), the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'"  In re Suprema, 438 F.3d at 277 (quoting In re Advanta Corp., 180 F.3d at 531 n.5).

A plaintiff who alleges securities fraud must "allege specific facts that give rise to a 'strong inference' that the defendant possessed the requisite intent."  Burlington Coat, 114 F.3d at 1418.  A plaintiff may establish this strong inference of scienter "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  In re Suprema, 438 F.3d at 276 (quoting Burlington Coat, 114 F.3d at 1418 (citations omitted).)  Recklessness, in turn, involves "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  In re Advanta Corp., 180 F.3d at 535 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).  "[S]cienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior."  Id.

13

Thus, in analyzing the claims set forth in the Complaint, this Court will be applying the pleading requirements established by Rule 10b-5, the heightened pleading requirements imposed by FED. R. CIV. P. 9(b), and the standards established by the PSLRA.

## ANALYSIS

### A.    Materiality

The materiality claim should be the first step in the analysis.  Burlington Coat, 114 F.3d at 1417 ("[T]he first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.").  To be material, there must be a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.'"  In re Advanta Corp., 180 F.3d at 538 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

The Third Circuit, in Burlington Coat, "fashioned a special rule for measuring materiality in the context of an efficient securities market.  [In an efficient securities market,] the price of a company's stock is determined by all available information regarding the company and its business.  In such an efficient market, 'information important to reasonable investors . . . is immediately incorporated into the stock price.'  As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking at the movement, in the period immediately following disclosure, of the price of the firm's stock. Because in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed . . . was immaterial as a matter of law.'"  Oran v.

14

Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (quoting Burlington Coat, 114 F.3d at 1425) (internal citations omitted).  In Merck, the Third Circuit noted that, "as compared to the other courts of appeals, [it] ha[d] one of the 'clearest commitments' to the efficient market hypothesis" as exemplified in the Oran-Burlington standard.  In re Merck & Co. Sec. Litig., 432 F.3d 261, 269 (3d Cir. 2005) (internal citations omitted).

Before reaching the question of materiality, this Court will address Defendants' arguments that, since the Complaint fails to identify any specific misleading statements, this Court need not reach the question of materiality.  That is, Defendants argue that the Complaint simply provides factually accurate statements, and then broadly alleges that these statements are false.  In making this argument, Defendants are ignoring part of Rule 10b-5, namely that it is unlawful "to omit to state a material fact necessary in order to make the statements made. . . not misleading."  17 C.F.R. § 240.l0b-5(b).

In the Complaint, Plaintiffs allege that statements made by Katz, Kaplan, and the Company during the Class Period were false because they omitted material information regarding plans to expand the business and to improve customer service.  (Am. Compl. ¶ 32.)  The Complaint also alleges that Katz's statement made regarding a goal of a 30% pretax operating margin was false because the Company would never be able to reach that goal in 2005 due to the unannounced expansion plans.[11]  (Am. Compl. ¶ 32.)  Since the Complaint alleges the omission of two facts – the plans to expand the business and to improve customer service – and one false

---

[11]  The Complaint alleges that Defendant Katz failed to disclose that his statement that the Company expected to hit a 30 percent pretax operating margin had no possibility of taking place in 2005 because of the Company's plan to embark on a series of growth initiatives.  (Am. Compl. ¶ 32.)  While phrased in terms of an omission, this allegation is much more similar to a false statement

statement – the 30% pretax operating margin[12] – Plaintiffs have satisfied the requirement of

---

[12]  While acknowledging that Plaintiffs have alleged that the goal of reaching the 30% pretax operating margin in 2005 is a false statement, this Court cannot identify any basis for Plaintiffs' allegation.  Plaintiffs point to Katz's comment on November 2, 2004, in which he stated "[o]ur internal sites [sic] are set on the fast pursuit (ph) of a million AudibleListeners, *and if you've studied our business model dynamics, you can understand why we expect to hit 30 percent pretax operating margins early in that growth front.*  The key metrics associated with our business all point to a strong finish to 2004 and solid momentum as we look out to 2005." (Am. Compl. ¶ 30 (emphasis in original) (SEC Form 8-K filed by Audible, Inc. on November 2, 2004 at 6, attached as Ex. C to the Mem. in Supp. of Defs.' Mot. to Dismiss (hereinafter "Ex. C")).)  However, nowhere in that statement did Katz say Audible would reach the 30% pretax operating margin in 2005.  Rather, he said that Audible would reach that goal early in the growth front of reaching 1 million AudibleListeners.  Further, considering the statement in the context of the teleconference as a whole, it was clear that Katz did not intend to specify goals for 2005.  For example, immediately following Katz's comment regarding growth to 1 million AudibleListeners, Eugene Munster, of Piper Jaffray, asked about growth drivers for Audible's business.  Specifically, he asked "is that as you see the base in iPod's [sic] go from basically 4 millions [sic] to 6 million last quarter and could be 9 or 10 million at the end of the December quarter, is there a tidal wave that hits your business? . . .  when would that start rolling in?  Because you haven't really talked much about '05, but would that have a powerful impact on March or June quarter in '05, or any thoughts on when we could see that?"  Katz replied that "[w]e are not going to get that granular."  (Ex. C at 6.)  Similarly, Mark Argento with ThinkEquity Partners asked, "[i]n terms of you put it out there, this million sub-goal.  What kind of timing are you talking about?  Is that kind of a three to five-year type of goal?  How quickly do you continue to see, I mean the fact that you talk about sequentially adding subs or sequential growth on a quarter-over-quarter basis, and theoretically you get there pretty quickly, what is your thought there on your time horizon?"  Katz responded, "[m]y thoughts obviously are that we will get there really fast and we will do that because the entire organization comes to work every day expecting that to happen faster and faster and faster.  But as to exactly when that happens, clearly, there's elements in the environment that are out of our control that makes that difficult to project.  So I'm not going to [be] able to help you much in terms of how that models."  (Ex. C at 10.)

        While this Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party, this does not mean that the Court has to accept far-fetched inferences that are, in fact, closer to fiction than fact.  City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 (3d Cir. 1998) ("For example, we need not accept as true 'unsupported conclusions and unwarranted inferences.'" (quoting Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997)); Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997) ("courts, when considering 12(b)(6) motions, have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,'

identifying purportedly misleading statements in the form of the two alleged omissions.

Plaintiffs allege in their Complaint that in reaction to the announcements[13] on February 15, 2005, the price of common stock plummeted, falling from $26.70 per share on February 15, 2005 to $17.32 on February 16, 2005, a one-day decline of 35%, on unusually heavy trading volume of 20.9 millions shares.  (Am. Compl. ¶ 48.)  Defendants contend that there may be many reasons why this happened.  (Br. in Support of Defs.' Mot. to Dismiss Consol. Class Action Compl. 8.)  They argue that by itself, the decline in stock price provides no support for Plaintiffs' conclusory assertion that the February 15, 2005 press release "disclosed" some "truth" that Defendants had been fraudulently concealing since at least November 2, 2004.  (Br. in Support of Defs.' Mot. to Dismiss Consol. Class Action Compl. 9.)  Although there may exist a multitude of reasons for the sudden decline of the price of the Audible stock, in considering a motion to dismiss, this Court only needs to determine whether Plaintiffs have pled facts with sufficient specificity to support their allegation, not whether Plaintiffs can prove their allegations.  Hishon, 467 U.S. at 73.

---

'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations'" (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1357 (2d ed. 1997))).

This Court cannot allow Plaintiffs to manufacture statements and then attribute them to Defendants.  While in some instances the line between fact and fiction may be faint and blurred, in this case the line is clear: during the teleconference on November 2, 2004, Katz never said, or even implied, Audible would reach a 30% pretax operating margin in 2005.  In fact, considering the teleconference as a whole, there is no way that this Court can infer that Katz implied that Audible would reach a 30% pretax operating margin in 2005.  Therefore, this Court concludes that this statement is not a false statement that could form a basis for the 10(b)-5 claim.

[13]  On February 15, 2005, after the close of trading, Audible issued a press release announcing results for its fourth quarter of 2004.  (Am. Compl. ¶ 43.)  Along with those results, Audible announced a series of new capital intensive spending plans and initiatives which would require substantial investments in infrastructure, new business units and marketing.  (Am. Compl. ¶ 44.)

Here, Plaintiffs have alleged that Audible's securities were traded in an open, well developed, and efficient market.[14]  (Am. Compl. ¶ 53.)  Plaintiffs further allege that immediately following the February 15, 2005, announcements of the expansion plans, Audible's common stock suffered a 35% decline in price after an unusually heavy trading volume of 20.9 million shares.  (Am. Compl. ¶ 48.)  Under the Third Circuit's test for materiality, these allegations demonstrate that the February 15, 2005, announcement was material.  That is, Plaintiffs have alleged that the stock traded in an efficient market; an announcement was made, and the stock price fell.  Therefore, drawing all inferences in favor of Plaintiffs as this Court must in considering a motion to dismiss, this Court concludes that Plaintiffs have alleged materiality sufficiently, which is the first factor the Third Circuit finds necessary for stating a claim under § 10(b).

**B.     Scienter**

Turning to the next factor – scienter – plaintiffs need to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  A plaintiff may establish this strong inference of scienter "'either (a) by

---

[14]  "At all relevant times, the market for Audible's securities was an open, well developed, and efficient market for the following reasons, among others: (a) Audible's stock met the requirements for listing, and were [sic] listed and actively traded on the NASDAQ, a highly efficient and automated market; (b) [a]s a regulated issuer, Audible filed periodic public reports with the SEC and NASDAQ; (c) Audible regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) Audible was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force of certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace."  (Am Compl. ¶ 53.)

alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  In re Suprema, 438 F.3d at 276 (quoting Burlington Coat, 114 F.3d at 1418 (citations omitted)).  The Third Circuit has stated that "[i]t is well established that a pleading of scienter 'may not rest on a bare inference that a defendant 'must have had' knowledge of the facts.'"  In re Advanta Corp., 180 F.3d at 539 (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 26 (1st Cir. 1992)).  "Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'"  Id. (quoting Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998)).  "Generalized imputations of knowledge do not suffice, regardless of the defendants' position within the company."  Id.

     In reviewing the Complaint, this Court finds that the only allegations regarding scienter are very general in nature, and based solely on Defendants' positions in the Company.  Specifically, the Complaint alleges that "Individual Defendants, as senior executive officers and/or directors of Audible, were privy to confidential and proprietary information concerning Audible, its operations, finances, financial condition, and present and future business prospects."  (Am. Compl. ¶ 16.)  Further, "[b]ecause of their positions with Audible, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects."  (Id.)  Finally, the Complaint states that "Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws."  (Am. Compl. ¶ 55.)

If, in fact, this was simply an overview of their allegations, which were then later supported with specific facts, there would be sufficient information to support the allegation of scienter.  However, nowhere in the Complaint do Plaintiffs provide any support for these statements.  Plaintiffs point to no specific facts that demonstrate that Katz or Kaplan had any knowledge of the alleged omissions.

Nonetheless, Plaintiffs submit that, when taken as true and drawing all reasonable inferences in favor of Plaintiffs, the allegations of the Complaint more than amply provide circumstantial evidence of Defendants' knowledge of the pending capital expenditures plan at or before the beginning of the Class Period.  (Lead Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Consol. Am. Class Action Compl. 19).  However, the Third Circuit has stated clearly that "a pleading of scienter 'may not rest on a bare inference that a defendant 'must have had' knowledge of the facts.'"  In re Advanta Corp., 180 F.3d at 539.  Plaintiffs' allegations are just what the Third Circuit has said are inadequate; namely, the allegations are simply generalized imputations of knowledge, based on Defendants' positions within the company.  See id.

In an effort to support their general allegations of scienter, Plaintiffs provide statements from two confidential sources.  Allegedly, the first confidential source ("CS-1") was familiar with several internal conditions at Audible just prior to and during the Class Period.  According to Plaintiffs, these conditions indicated, well ahead of time, that Audible would need to make the capital outlays which Audible belatedly announced at the end of the Class Period.  (Am. Compl. ¶

20

51.)  During his time as a technical support analyst at Audible, CS-1 was directly involved with

handling customer complaints and attempting to save customers threatening to end their Audible

service.  (Am. Compl. ¶ 51.)  CS-1 also reported that it was known, well ahead of the time, that

Audible announced that it would be spending money on operations in Europe, inasmuch as CS-1

had to train employees for the European operations months before the February 15, 2005,

announcement.  (Am. Compl. ¶ 51.)

    These statements fail to support an allegation of scienter.  First, Katz and Kaplan openly

discussed Audible's efforts to retain customers and handle complaints during the teleconference

on November 2, 2004.  (Ex. C at 3 -5.)  Therefore, the information provided by CS-1 was nothing

more than what the public already knew.  Additionally, the training of employees for European

operations does not provide evidence of Audible's expansion into the UK.  Since Audible already

had established operations in France and Germany (Ex. C at 2), training for European operations

could have been for those locations.

    The second confidential source ("CS-2") worked as a technical support representative at

Audible for two years, through August 2004.  (Am. Compl. ¶ 52.)  CS-2 similarly confirmed the

difficult conditions at Audible which made the need for capital outlays allegedly a foregone

conclusion well before the end-of-Class-Period announcement.  (Am. Compl. ¶ 52.)  CS-2

reported that Audible suffered from "lots of problems with equipment issues."  (Am. Compl. ¶

52.)  CS-2 estimated that there were 50 to 60 customer complaints per day on these issues alone.

(Am. Compl. ¶ 52.)

    The general statements do not provide specific support for allegation of scienter.  Even if

the statements of both confidential sources indicated that they knew in mid-2004 that Audible

planned on expanding into the UK, and planned to improve its customer service beyond the public statements made by Katz and Kaplan, their knowledge cannot be imputed to Katz and Kaplan. Further, nothing in their statements implies that Katz and Kaplan shared their knowledge.

Even if Plaintiffs had pled sufficient facts to demonstrate that Defendants had knowledge of the expansion plans prior to the public announcement in February 2005, that knowledge would not be enough, in and of itself, to support Plaintiffs' claim that the public statements omitted material information.  Rather, Plaintiffs must allege "facts giving rise to a strong inference of conscious wrongdoing."  In re Advanta Corp.,180 F.3d at 535.  A plaintiff may establish this strong inference of scienter "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  Burlington, 114 F.3d at 1418.

Plaintiffs argue that Katz and Kaplan had the motive and opportunity to commit fraud. That is, Plaintiffs claim that Defendants were motivated to keep Audible's stock price artificially inflated so that they could sell their shares at this inflated price prior to the anticipated drop in price that announcement of the expansion plans would produce.  (Am. Compl. ¶ 57.)

In Burlington Coat, the Third Circuit considered allegations that several officers of Burlington Coat Factory Warehouse Corporation ("Burlington") had artificially inflated Burlington's stock price by overestimating their earnings so that they could sell some of their Burlington stock at the inflated prices.  Once the actual results, which were below the company's estimates, were announced, Burlington's stock price fell sharply.  The Third Circuit concluded that it "will not infer fraudulent intent from the mere fact that some officers sold stock" at the higher prices.  Burlington Coat, 114 F.3d at 1424.  In explaining its reasoning, the court observed

22

that "[a]s a general matter, though, causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation that may be tied to the long-term performance of the company.  This is so because these disseminations of false information (that are eventually discovered by the market) increase the volatility of the company's stock and in turn increase its risk and long-term price." Burlington Coat, 114 F.3d at 1423 n.12.

The Third Circuit also considered the quantity of stock that defendants sold, and concluded that, while the complaint alleged that several of the officers had sold stock at the inflated prices, there was no information as to whether these sales "were normal and routine for [those] defendant[s].  Nor d[id the court] have information as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud." Burlington Coat, 114 F.3d at 1423.

Similarly, in Oran v. Stafford, the Third Circuit concluded that since plaintiffs did "not allege the total number of shares held by each of the officers or the amounts of their base compensation," the district court was correct in concluding that "the absence of this information was fatal to plaintiffs' case against the officer-defendants because 'plaintiffs provide[d] no information as to whether the trades were normal and routine for each executive.'" Oran v. Stafford, 226 F.3d at 289 (quoting Oran v. Stafford, 34 F. Supp. 2d 906, 910 (D.N.J. 1999)).

Here, Plaintiffs likewise do not allege what the Defendants' compensation was, nor do they provide any information on whether the stock sales were unusual in size or timing.  Plaintiffs do, however, provide information on the number and percentage of shares sold by each Individual

23

Defendant.  Unfortunately, this information fails to provide the detail required by the Third Circuit in analyzing the question of motive and opportunity.  While the Complaint refers to each Individual Defendant's proceeds from their stock sales, these amounts are in fact the gross proceeds received from the sales, and not the actual profit.  Furthermore, it appears that the calculations for the percentage of the Defendants' total holdings included in the offering is wrong because Plaintiffs failed to include exercisable stock options in their calculations.[15]  Finally, there is evidence that at least some of these stock sales were made via Rule 10(b)5-1 plans, which would prevent those shares from being considered in the motive and opportunity analysis.  For these reasons, Plaintiffs fail to plead sufficiently that Defendants had motive and opportunity to commit fraud.

"'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'"  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

Plaintiffs allege that Katz's and Kaplan's nondisclosure rose to the level of recklessness. Plaintiffs assert that "[a]s demonstrated by Defendants' overstatements and misstatements of the Company's business operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading."  (Am. Compl. ¶ 66.)

_____

[15] See supra note 9.

Recklessness involves "'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" In re Advanta Corp., 180 F.3d at 535 (quoting McLean, 599 F.2d at 1197). In GSC Partners, the Court held that is was not enough for plaintiffs to allege that defendants "knew" their statements were fraudulent or that defendants "must have known" their statements were false. GSC Partners CDO Fund, 368 F.3d at 239. Rule 9(b) and the PSLRA impose heightened pleading requirements when asserting Rule 10b-5 claims. Plaintiffs' vague allegation of recklessness is unsupported by specific factual statements. Plaintiffs simply assert that Defendants were reckless by deliberately failing to determine whether the statements made during the Class Period were false and misleading, but fail to plead facts supporting this claim with any particularity.

Since the Complaint fails to allege sufficiently specific facts, as required by the Third Circuit, this Court concludes that the broadly worded conclusory statements made by Plaintiffs do not constitute specific "facts giving rise to a strong inference of conscious wrongdoing," on the part of Defendants. In re Advanta Corp.,180 F.3d at 535. Plaintiffs have failed to plead sufficient facts to demonstrate either motive and opportunity or recklessness, thus, the Rule 10b-5 claim must be dismissed for failing to plead scienter. Since the factors used in evaluating a § 10(b) claim are conjunctive, and plaintiffs have failed to satisfy the scienter requirement, this Court's analysis can stop at this point.

**C.      Controlling Person Liability**

The Second Claim in the Complaint alleges a violation of § 20(a) of the Exchange Act (15

U.S.C. § 78t(a)) as to all of the individual defendants.  Section 20(a) provides that

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to state a claim under this section, "[p]laintiffs must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions. . . . 'To establish that a defendant is a control person, a plaintiff must demonstrate [that] 'the defendant had actual power or influence over the allegedly controlled''company."  Jones v. Intelli-Check, Inc., Civ. Action No. 01-CV4860 (FLW), 2003 WL 21783693, at *28 (D.N.J. July 30, 2003) (internal citations omitted) (quoting In re: MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)).  "[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws."  Rockefeller Center Properties, 311 F.3d at 211.

As discussed above, Plaintiffs have failed to plead a predicate violation of the securities laws.  Therefore, this claim must be dismissed.

26

**D.     Conclusion**

Since Plaintiffs fail to allege scienter, the 10(b)-5 claim will be dismissed.  Additionally, since Plaintiffs have failed to plead an underlying violation of the securities laws, which is a prerequisite for stating a claim under § 20(a) of the Exchange Act, that claim will also be dismissed.  Plaintiffs shall have 30 days to file an amended complaint, if they so choose.


Dated: April 3, 2007

                                 S/Joseph A. Greenaway, Jr.                      
                                JOSEPH A. GREENAWAY, JR., U.S.D.J.